**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **VANESSA BUDHUN,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **No. 10-cv-06921** |
| | : | |
| **THE READING HOSPITAL AND** | : | |
| **MEDICAL CENTER,** | : | |
| **Defendant.** | : | |

**M E M O R A N D U M**

**Stengel, J.** **May 7, 2015**

## I. BACKGROUND[1]

Plaintiff Vanessa Budhun worked for Berkshire Health Partners (BHP), an affiliate of defendant The Reading Hospital Medical Center (TRHMC), as a temporary employee from January 2008 until April 18, 2008 when she was permanently hired as a credentialing assistant.[2] She took the place of Ms. Linda Shriner.[3] Shriner had exhausted her available leave of absence on March 18, 2008 and was later terminated on April 3, 2008 when she did not return to work.[4]

[1] This Family Medical Leave Act (FMLA) action was remanded by the Third Circuit to this court for further consideration. The plaintiff Vanessa Budhun injured her finger and was placed on FMLA leave. Subsequently, she was terminated from her position with defendant Reading Hospital and Medical Center (TRHMC). Specifically, I have been asked to determine whether the second and third prongs of the plaintiff's retaliation claim allow summary judgment to be entered in the defendant's favor. I discuss only the facts and procedural history relevant to my decision in this memorandum.

[2] Doc. No. 29-3 at ¶ 1; Doc. No. 27 at 3.

[3] Doc. No. 29-3 at ¶ 79; Doc. No. 27 at 3.

[4] Doc. No. 29-3 at ¶ 79; Doc. No. 27 at 3.

As a credentialing assistant, Ms. Budhun was responsible for verifying and processing medical providers' credentialing applications.[5] On July 30, 2010, Ms. Budhun broke her right pinky finger and was fitted with a metal splint.[6] She took a leave of absence under the FMLA.[7] Ms. Budhun's doctor initially expected her to be out of work until September 8, 2010.[8] After a reevaluation on September 8th, he prescribed occupational therapy and wrote Ms. Budhun a note stating that she would be out of work at least until the next appointment on November 9, 2010.[9] Immediately after her appointment, Ms. Budhun emailed both Ms. Sherri Alvarez, her supervisor, and Ms. Stacy Spinka, a TRHMC Human Resources representative, updating them on her medical condition.[10] Both acknowledged receipt of that email within a day.[11]

At her first therapy session on September 10, 2010, however, Ms. Budhun's therapist indicated she may be back to work within a month.[12] Budhun continued to update Alvarez on her progress.[13] On September 13, Ms. Budhun emailed Ms. Alvarez and Ms. Spinka, saying that she believed her doctor would allow her to return to work by

[5] Doc. No. 29-3 at ¶ 8; Doc. No. 27 at 3.

[6] Doc. No. 29-3 at ¶ 8.

[7] Id. at ¶ 10; Doc. No. 27 at 4, 5.

[8] Doc. No. 29-3 at ¶ 20; Doc. No. 27 at 6.

[9] Doc. No. 29-3 at ¶¶ 21-22; Doc. No. 27 at 7.

[10] Doc. No. 29-3 at ¶ 23.

[11] Id. at ¶¶ 24-25.

[12] Id. at ¶¶ 26-27.

[13] Id. at ¶ 28.

the end of September.[14] Spinka extended her FMLA leave until September 23, 2010, when it would be exhausted, and approved her for non-FMLA leave until November 9, 2010.[15]

On September 15, 2010, Ms. Alvarez, President of BHP Charles Wills, and Director of Health and Lifestyle Management Dawn Dreibelbis held a telephone conference with Spinka and her supervisor.[16] The meeting was to discuss Budhun's continued absence.[17] The fact that Budhun may be returning before the end of the month may not have been discussed.[18] At some point, Alvarez, Dreibelbis, and Wills decided that Budhun would be replaced.[19]

---

[14] Doc. No. 27 at 7; Doc. No. 29-3 at ¶ 29. Alvarez confirmed receiving this email after Budhun sent her another email on September 22nd. Id. at ¶ 38.

[15] Doc. No. 29, Ex. V; Doc. No. 29-3 at ¶ 30; Doc. No. 27 at 7. Under the FMLA, TRHMC provides up to twelve (12) work weeks of job-protected FMLA leave to eligible employees during a rolling twelve-month period. Doc. No. 27 at 4. Ms. Budhun admits that she received at least twelve weeks of leave under the FMLA in calendar year 2010. Id. at 8. TRHMC requires medical certification of an employee's ability to return to work before the employee is restored to their former position of employment. Id. at 4. Employees of TRHMC are also eligible for a non-FMLA leave, which is unprotected time off; employees on non-FMLA leave still receive health and other benefits. Id. at 7. An employee who fails to return to work from non-FMLA leave might be considered to have voluntarily quit. Id. at 8. Ms. Budhun's FMLA leave and non-FMLA leave requests were managed by Spinka. Doc. No. 29-3 at ¶ 3.

[16] Id. Alvarez was Budhun's direct supervisor. Alvarez reported to Dreibelbis. Dreibelbis reported to Wills. Doc. No. 29-3 at ¶¶ 2-3.

[17] Id. at ¶ 31; Doc. No. 27 at 8.

[18] Alvarez did not inform anyone at the meeting that Budhun might return to work before the end of the month. Doc. No. 29-3 at ¶ 32. Spinka may have mentioned Budhun's possible return, but this is not clear. Id. at ¶ 33. Spinka did not remember informing anyone of this but Alvarez testified that she did mention it. Doc. No. 29, Ex. R at 95-96. Dreibelbis testified that neither Spinka nor Alvarez informed her of Budhun's possible return. Doc. No. 29, Ex. S at 33-40.

[19] No. 29-3 at ¶ 36.

Ms. Budhun's splint was removed sometime before her September 23, 2010 therapy appointment.[20] On September 23, 2010, she called Ms. Alvarez to inform her that she should be returning to work the week of September 27, 2010.[21] That same day at 12:54 PM Mary Solynties, Wills' administrative assistant, submitted a form to Human Resources requesting that Ann Rushow replace Ms. Budhun. Rushow was a part-time medical claims repricer who was asked to fill-in for Budhun when she was out.[22] Ms. Rushow was offered the position on September 25, 2010, and Human Resources completed the necessary paperwork two days later.[23] Ms. Rushow did not begin working in this position until October 4th because she took a pre-scheduled vacation the week of September 27th.[24]

Alvarez and Dreibelbis attempted to reach Budhun on September 27th and 28th.[25] On September 29, 2010, Ms. Budhun sent an email telling Ms. Alvarez and Ms. Spinka that she would be cleared to return to work on October 4, 2010.[26] Alvarez and Dreibelbis

---

[20] Id. at ¶¶ 41-42.

[21] Id. at ¶ 43.

[22] Id. at ¶ 7; Doc. No. 27 at 8. Ms. Budhun also twice requested leave under the FMLA. Ms. Budhun first requested and took FMLA leave beginning March 31, 2010 through April 16, 2010, and then again from April 26, 2010, through May 7, 2010 for other medical reasons. See Doc. No. 27, Ex. K and L. Ms. Budhun was reinstated from that leave on May 10, 2010. Doc. No. 29-3 at ¶ 6; Doc. No. 27 at 4. Ms. Budhun knew that her position was not guaranteed once her FMLA leave was exhausted. Id. at 4.

Rushow's hours had been reduced to part-time. With the additional time she spent in credentialing, she was working full-time hours. Doc. No. 29, Ex. U at 9-11.

[23] Doc. No. 29-3 at ¶¶ 46-47; Doc. No. 27 at 9.

[24] Doc. No. 29-3 at ¶¶ 60, 82.

[25] Id. at ¶¶ 48-49; Doc. No. 27 at 9.

[26] Doc. No. 29-3 at ¶ 50; Doc. No. 29, Ex. C; Doc. No. 27 at 9.

then called Ms. Budhun and informed her that her position had been filled.[27] Through additional communications, Ms. Spinka informed Ms. Budhun that because of prior written disciplinary actions, she would not be able to transfer to another position within the hospital, but she would be eligible for rehire.[28] Ms. Budhun was asked to pick up her belongings and return her ID badge and keys on October 6, 2010.[29]

Ms. Budhun did not apply for another position at TRHMC and did not contact Human Resources or return to work after the expiration of her non-FMLA leave on November 9, 2010.[30] Due to her inaction, Ms. Budhun was formally considered separated from employment on November 10, 2010.[31] She contends that the events surrounding her termination and formal separation from TRHMC both interfered with her rights under the FMLA and were retaliation for invoking her rights under the FMLA. I granted summary judgment in favor of the defendant on both claims. Budhun v. Reading Hosp. and Medical Center, No. 10–CV–06921, 2011 WL 6002024, at *8 (E.D. Pa. Nov. 30, 2011).

---

[27] Doc. No. 29-3 at ¶ 51.

[28] Doc. No. 27 at 10; Doc. No. 29-3 at ¶ 53. During her employment, Ms. Budhun was subjected to two separate corrective actions. The first was on January 8, when Ms. Budhun called her supervisor, Sherri Alvarez, a "f**king liar." Doc. No. 27 at 3. Ms. Alvarez was Ms. Budhun's direct supervisor from the summer of 2009 and at all times relevant to this action. Doc. No. 29-3 at ¶ 2. The second corrective action was issued on January 25, 2010 for excessive tardiness. Doc. No. 27 at 3.

TRHMC's published policy on internal transfers states that an individual who has been disciplined in the last year resulting in a final written warning or higher from the date of their application for transfer is ineligible to transfer to another position within TRHMC. Id. at 4.

[29] Doc 29-3 at ¶ 56; Doc. No. 29, Ex. C.

[30] Doc. No. 27 at ¶¶ 59-60.

[31] Id. at 12.

Budhun appealed. The Third Circuit reversed on the interference claim, finding genuine disputes of material fact about whether Ms. Budhun invoked her right to return to work and whether she could perform an essential function of her job. Budhun v. Reading Hosp. and Medical Center, 765 F.3d 245, 256 (3d Cir. 2014). That claim will proceed to trial.[32] The circuit court remanded the retaliation claim for further consideration.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party" based on the evidence in the record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" when it "might affect the outcome of the suit under the governing law." Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating to the district court that "there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its

[32] The Third Circuit also affirmed my decision to deny Ms. Budhun's motion for leave to amend her complaint. Budhun v. Reading Hosp. and Medical Center, 765 F.3d 245, 259-60 (3d Cir. 2014).

initial burden, the adverse party's response must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1). Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must draw "all justifiable inferences" in favor of the non-moving party. Anderson, 477 U.S. at 255. The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's "version of events against the opponent, even if the quantity of the [moving party's] evidence far outweighs that of its opponent." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

**III. DISCUSSION**

On the retaliation claim, I granted summary judgment in TRHMC's favor because Ms. Budhun failed to establish a *prima facie* case for retaliation—the first prong of the McDonnell-Douglas burden shifting test. Budhun v. Reading Hosp. and Medical Center, No. 10–CV–06921, 2011 WL 6002024, at *7 (E.D. Pa. Nov. 30, 2011). I found that Ms.

Budhun failed to show an adverse employment action because she was, in fact, unable to return to work when her non-protected leave expired in November 2010. Id. at *6. She also could not show the last element of the *prima facie* case because her termination in November was not close in time to her taking FMLA several months earlier. Id. at *6-7.

The Third Circuit disagreed and held that Ms. Budhun had established a *prima facie* case. The Third Circuit considered Ms. Budhun to have been constructively terminated when she was replaced by Rushow in September 2010. Budhun v. Reading Hosp. and Medical Center, 765 F.3d 245, 258 (3d Cir. 2014). Since the decision to replace Ms. Budhun occurred around the time her FMLA expired, the Third Circuit found a causal connection between the adverse employment action and her taking leave under the FMLA. Id. I am now asked to consider the second and third prongs of the retaliation claim under McDonnell-Douglas.

**a. Prong Two: TRHMC Offered a Legitimate Nondiscriminatory Reason**

Because Ms. Budhun has established a *prima facie* case of retaliation, the burden shifts to TRHMC to articulate a legitimate nondiscriminatory reason for constructively terminating the plaintiff. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). TRHMC has met this "relatively light burden." Id. The hospital offered testimony that Ms. Budhun was replaced because it was experiencing a backlog as a result of her absence. This backlog for the credentialing of their network physicians could result in providers

not getting paid, among other repercussions.[33] This reason would be considered non-discriminatory, if taken as true. Id.

**b. Prong Three: Genuine Disputes of Material Fact on Pretext**

The burden shifts back to Ms. Budhun to show that the nondiscriminatory reason TRHMC provided is a pretext for actual discrimination. Fuentes, 32 F.3d at 763. "[T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id. at 764. A plaintiff can meet this final burden by showing that an employer's alleged reasons for the action contain "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" that a jury could rationally fail to credit them. Id. at 765.

There are several disputes of fact material to the pretext analysis. First and most importantly, the plaintiff disputes that there was an actual backlog in credentialing or an urgency in filling the plaintiff's position. Both Ms. Alvarez and Ms. Dreibelbis testified that there was no urgency to replace Ms. Budhun.[34] Ms. Alvarez testified that the department was managing with Ms. Rushow's part-time help and that there was no need to replace Budhun before the end of September.[35] Rushow also did not work at all during

[33] See Doc. No. 27 at 18-19.

[34] Doc. No. 29, Ex. S at 30, 33, Ex. R at 105.

[35] Doc. No. 29, Ex. R at 105, 109.

the week of September 27, 2010 because she was on a pre-scheduled vacation.[36] No one else was hired temporarily or transferred temporarily to help in credentialing while Rushow was out.[37]

The Credentialing Department had an internal deadline of 90 days for credentialing files and 60 days for re-credentialing files.[38] According to Wills, internal deadlines for processing credentialing files were being missed.[39] However, these were internal deadlines, not those set by the National Committee for Quality Assurance (NCQA, a national healthcare accreditor). Wills testified that none of the NCQA deadlines, which were different than the internal deadlines, were being missed.[40] Dreibelbis testified that the department was not missing any verification deadlines.[41] Budhun also claims she had already processed files with internal deadlines for August, September, and October 2010 and some files with deadlines in November 2010 before she took her leave of absence.[42]

The initial communications about why the plaintiff was replaced also do not offer any sense of urgent need. The email Spinka sent to Budhun did not explain why

---

[36] Doc. No. 29, Ex. U at 22.

[37] Doc. No. 29, Ex. R at 113.

[38] See Doc. No. 29, Ex. A.

[39] Doc. No. 29, Ex. P at 73-76 (Dep. of Charles Wills).

[40] Id.; Doc. No. 27, Ex. D at 71-72.

[41] Doc. No. 29, Ex. S at 15-16.

[42] See Doc. No. 29 at Ex. A.

Budhun's position was filled beyond noting "the need that they had."[43] Dreibelbis also testified that because Budhun's leave was unprotected as of September 23rd, the company "would be able to fill [her] position if [it] had operational needs, and [it] did."[44]

Second, the purpose of the September 15th meeting is disputed. The electronic invitation for the telephone conference, sent to the attendees, was titled "Handling transition FMLA to non protected leave meeting."[45] Spinka testified that Human Resources did provide Wills, Dreibelbis, and Alvarez with several options to cover Budhun's work while she was out during that meeting.[46] Ms. Alvarez testified that during the meeting the participants asked where Ms. Budhun stood as far as her FMLA leave and her transition to non-protected leave.[47] Yet, the only options that were discussed, according to Alvarez, were how they would replace Ms. Budhun when she did not return after her FMLA was exhausted (i.e. whether to post the job or hire internally).[48] Dreibelbis testified that the only option discussed was to replace Budhun with Rushow.[49] Dreibelbis indicated that the purpose of the meeting was, in fact, to discuss with Human Resources whether that option was possible.[50]

---

43 Doc. No. 29, Ex. C at 1.

44 Doc. No. 29, Ex. S at 43.

45 Doc. No. 29, Ex. R at 86.

46 Doc. No. 27-1, Ex. C at 45; Doc. No. 29, Ex. T at 45-48.

47 See Doc. No. 29, Ex. R at 87-91.

48 Id. at 94.

49 Doc. No. 29, Ex. S at 33-36.

50 Id. at 36.

There also was no discussion of following up with Budhun to clarify her return date.[51] It is unclear if there was even *any* discussion about Budhun possibly returning before the end of the month.[52] Alvarez testified that she did not offer information about Budhun's possible return but thought Spinka had.[53] Spinka did not remember raising this point at the meeting.[54] Dreibelbis testified that neither Spinka nor Alvarez informed her of Budhun's possible return.[55] Such disputes, if resolved in the plaintiff's favor, could lead a jury to believe that the proffered reason for replacing Budhun—to address a backlog of work—was pretext.

Third, the date on which the defendant decided to replace the plaintiff is disputed. On the telephone call to Budhun informing her that her position had been filled, Alvarez and Dreibelbis told Budhun her position was filled as of September 27, 2015.[56] Alvarez, however, testified that the decision to replace Budhun happened several days after the September 15th meeting.[57] Dreibelbis testified that the decision to replace Budhun with Rushow was already made at the time of the September 15th meeting.[58] Dreibelbis offered Rushow the job on September 24th, the Friday before she was expected to start working

[51] Id. at 95.

[52] See Doc. No. 29, Ex. T at 49-51.

[53] Doc. No. 29-3 at ¶¶ 32-33.

[54] Doc. No. 29, Ex. R at 95-96.

[55] Doc. No. 29-3 at ¶ 34.

[56] See Doc. No. 29, Ex. B at 145, Ex. R at 112.

[57] Doc. No. 29, Ex. R at 112.

[58] Doc. No. 29, Ex. S at 37.

in credentialing and to also leave on her pre-scheduled vacation.[59] Spinka does not remember the date on which the decision to replace Budhun with Rushow was made but she said it was sometime after the September 15th meeting.[60] The personnel change form shows that the request to hire Rushow in Budhun's position was made on September 23, 2015 and finalized on September 27, 2015.[61] The timing of this decision could lead a jury to infer that the decision to replace Budhun was made based on her continued absence under the FMLA and not because of some urgent backlog.

Lastly, there is a dispute about the reason why Rushow was chosen to replace Budhun permanently. Alvarez testified that Rushow was moved into Budhun's position because Rushow's own position was being downsized. [62] Because she was going to be let go from that position, she would no longer be able to "help" in the credentialing department, according to Alvarez.[63] Dreibelbis testified that Rushow "may not have a job due to the lack of work in her department."[64]

Ms. Glouner, the Director of Repricing (Rushow's former department), testified to the contrary. According to her, Rushow was not in danger of being downsized when she was asked to permanently replace Budhun.[65] Instead, the department in which she had

[59] Doc. No. 29, Ex. S at 42.

[60] Doc. No. 29, Ex. T at 53.

[61] See Doc. No. 29, Ex. T at 55-61, Ex. Y.

[62] Doc. No. 29, Ex. R at 94. See Doc. No. 27 at 8.

[63] Doc. No. 29, Ex. R at 105.

[64] Doc. No. 29, Ex. R at 32.

[65] Doc. No. 29, Ex. P at 25-26.

worked included three part-time individuals, including Rushow. When Rushow left, the other two individuals became full-time employees and Rushow's position was not filled.[66] If a jury were to believe Glouner, not Alvarez and Dreibelbis, they could reasonably infer that the defendant's reason for replacing the plaintiff was pretextual.

If these disputes of fact are resolved in the plaintiff's favor, a reasonable factfinder could conclude that the defendant's assertion that they replaced Budhun due to an urgent backlog of work was not legitimate. See Fasold v. Justice, 409 F.3d 178, 186 (3d Cir. 2005). Overall, summary judgment would not be appropriate.[67] The plaintiff's retaliation count will also proceed to trial.

---

[66] Id. The plaintiff also alluded to the fact that the defendants favored Rushow and were looking for an opportunity to terminate the plaintiff. Budhun indicated that Rushow was given her desk after she took FMLA the first time in 2010. She was asked to move to an isolated office. See Doc. No. 29, Ex. A.

[67] The plaintiff has also offered evidence of other inconsistencies which could defeat summary judgment. First, she points out that TRHMC's policy for non-job protected leave is that, if possible, TRHMC will provide advanced notice to the individual on leave of the need to fill her position. See Doc. No. 29, Ex. D at VB022, Ex. T at 11. No one provided advanced notice to Ms. Budhun of the need to fill her position. See Doc. No. 29, Ex. R at 111, Ex. S at 37.

Second, the plaintiff also offers evidence that she was treated differently than her comparators. Although twelve other individuals were replaced while on non-FMLA leave, Ms. Budhun was the only individual replaced on the same day her FMLA leave expired. Doc. No. 29-2 at ¶ 57. See Doc. No. 29, Ex. W at 15 and Ex. X. Excluding Ms. Budhun, the individuals who were replaced after taking FMLA leave and non-FMLA leave were given an average of 17 days of non-FMLA leave before being replaced. See Doc. No. 29, Ex. X. Of the three individuals replaced after only taking a non-FMLA leave, the average amount of leave they took before being replaced was 52 days of leave. See Doc. No. 29, Ex. X. Ten out of twenty individuals who took both FMLA leave and non-FMLA leave were not replaced while on non-FMLA leave, and seven out of ten individuals who only took non-FMLA leave were not replaced. Doc. No. 29-2 at ¶ 57; Doc. No. 29, Ex. X. There are also a number of employee records which do not indicate one way or the other whether an employee was replaced while on leave. See Doc. No. 29, Ex. X and Ex. W.

More specifically, Linda Shiner, who the plaintiff replaced, would be the most analogous comparator to the plaintiff. She took leave from September 5, 2007 until March 18, 2008. See Doc. No. 29, Ex. N. She was terminated on April 3, 2008, several weeks after her leave had ended. See id. To deal with any backlog created by Shiner's absence, Budhun was hired as a temporary replacement from January 2008 until April 18, 2008 when she was permanently hired to replace Shiner, who did not return. Doc. No. 29-3 at ¶ 1; Doc. No. 27 at 3.

A jury presented with this information could infer that the defendant's proffered reason for replacing the plaintiff was pretext for discriminating against her for invoking her FMLA rights.

## IV. CONCLUSION

For the foregoing reasons, I will deny the defendant's motion for summary judgment regarding the plaintiff's retaliation claim under the FMLA.

An appropriate Order follows.